Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 2 CR 278 | **DATE** | 12/2/2002 |
| **CASE TITLE** | United States of America vs. Donville James | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: For the foregoing reasons, we deny defendant's motion for a new trial [71-1,2] and/or judgment of acquittal.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | DEC 3 - 2002 date docketed |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| | Copy to judge/magistrate judge. | |
| TSA | courtroom deputy's initials | 02 DEC -3 AM 8:14 date mailed notice |
| | | Date/time received in central Clerk's Office — mailing deputy initials |

Document Number 73

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) No. 02 CR 278 | |
| | ) | |
| DONVILLE JAMES, | ) Wayne R. Andersen | |
| | ) District Judge | |
| Defendant. | ) | |

DOCKETED
DEC 3 - 2002

## MEMORANDUM, OPINION AND ORDER

This case is before the Court on the motion of defendant, Donville James, for a new trial and/or a judgment of acquittal. For the following reasons, the motion is denied.

## BACKGROUND

On September 10, 2002, following a six-day jury trial, defendant James was convicted of: (1) attempted possession and distribution of a controlled substance, namely powder cocaine in excess of five kilograms, in violation of Title 21, United States Code, Section 846; (2) possession of a firearm during and in relation to a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i); and (3) possession of counterfeit notes, in violation of Title 18, United States Code, Section 472. The following facts were established at trial.

In March 2002, the defendant and a cooperating individual (CI) agreed on doing a narcotics transaction in which the defendant would pay for powder cocaine with counterfeit United States currency. The CI agreed to work with the FBI and Secret Service to do an undercover operation. As part of this operation, the CI told the defendant he knew a cocaine supplier who could provide them with powder cocaine.

73

Through several phone conversations in March 2002, the defendant and the CI discussed different quantities of powder cocaine to purchase using counterfeit currency. On March 21, 2002, the CI met the defendant and they agreed to purchase 10 kilograms of cocaine for $200,000 in counterfeit currency from the CI's source. The FBI and Secret Service conducted surveillance of this meeting, and the conversation between the defendant and the CI was recorded. On March 24, 2002, during a recorded phone conversation, the CI and the defendant agreed on purchasing 15 kilograms of powder cocaine for $300,000 in counterfeit currency. During this conversation, the defendant advised that he would have $200,000 in counterfeit money for the CI's source and would make it look like $300,000

On March 25, 2002, the CI and the defendant met in a McDonald's parking lot at the corner of Narragansett Avenue and Diversey Avenue in order to further discuss and conduct the planned transaction. Approximately 20 FBI and Secret Service agents were conducting surveillance of the area that day. In addition, the CI was wearing a hidden transmitter that enabled the agents to hear portions of the conversation between the defendant and the CI. During the meeting, the defendant asked the CI to get into his car so he could take the CI to see the counterfeit currency. The defendant drove the CI to a Nissan Ultima parked nearby. The car was driven by, and registered to, the defendant's girlfriend. The defendant showed the CI a bag inside the trunk of the Nissan Ultima that contained a large amount of counterfeit currency.
After the defendant showed the CI the counterfeit currency, the defendant and the CI went back to the CI's vehicle at McDonalds. The CI told the defendant that he spoke with his supplier and the supplier had left the kilograms of cocaine scattered in multiple cars at unspecified nearby locations. He told the defendant he was going to get the first five kilograms of cocaine and that

he would return shortly. The CI retrieved a bag containing five kilograms of simulated cocaine from a government vehicle parked nearby and returned to the defendant's car, which the defendant had relocated to a Jewel Foods parking lot across the street from McDonalds. The CI put the five kilograms on the passenger seat of the defendant's car and told the defendant he was going to get the next five kilograms of cocaine.

After the CI left, law enforcement agents pulled up in a car next to the defendant's vehicle. They got out of their car and approached the defendant's car yelling "police." At this point, the defendant attempted to flee. A second car with law enforcement officers attempted to stop the defendant's flight by blocking the defendant's path from the front. The defendant did not stop, but rather accelerated and collided with the law enforcement vehicle. After the initial impact, the defendant continued accelerating to free his car. Once his car was freed, the defendant turned his car and took off in the remaining unblocked direction. A third law enforcement car cut him off before he was able to drive out of the parking lot. After ordering the defendant out of his car, FBI and Secret Service agents arrested him. Agent Michael Newberg asked the defendant if he was armed, and the defendant replied that there was a gun in his car. The agents subsequently searched his car. In the front passenger's seat, agents discovered the bag containing the five kilograms of simulated cocaine. On the driver's side floorboard, agents discovered a loaded Smith and Wesson nine millimeter semi-automatic pistol.

Once the defendant was transported to the Secret Service Field Office, he was advised of his rights by Agent William McKenna. Defendant agreed to waive these rights and speak with the agents. He then hand wrote a confession stating that he planned to buy 15 kilograms of powder cocaine with counterfeit currency and that he planned to give some of the drugs to a

member of the Gangster Disciples, from whom he had purchased $100,000 of counterfeit currency. He further wrote that he had cut up blank pieces of paper to add to the $100,000 in counterfeit currency that he had purchased. He also confessed verbally that he possessed the gun agents found in his car for protection.

A search of the defendant's girlfriend's car revealed a black bag containing $87,430 in counterfeit currency along with blank pieces of cut paper. Some of the counterfeit currency was one-sided and sandwiched between the two-sided counterfeit currency. Defendant's girlfriend gave a written statement in which she admitted that she saw the defendant making counterfeit money in his apartment at 7535 South Saginaw. She further admitted that the defendant told her he was going to make thousands of dollars by selling the counterfeit bills.

After the agents had interviewed the defendant's girlfriend, they conducted a subsequent interview with the defendant to ask him about the information his girlfriend supplied. At that point, the defendant admitted (after earlier providing 2 Waukegan addresses) that he lived at 7535 South Saginaw and that he had attempted to make additional counterfeit currency to add to the counterfeit currency he had purchased. He further explained that he was having trouble making two-sided counterfeit currency and could only produce front or back images. The defendant consented in writing to a search of his apartment and supplied the agents with a key. The search of his residence uncovered additional counterfeit currency and various pieces of counterfeit-making equipment, including a computer, two copier/scanners, a pound of rubber bands, and a paper cutter. Some of the counterfeit currency found at the defendant's residence was lined up in a row on the copier/scanners. In addition, some of this counterfeit was marked

with the same serial numbers as the counterfeit currency found in the defendant's girlfriend's car. A subsequent search of the defendant's computer revealed images of a $50 bill.

## DISCUSSION

Defendant's motion seeks a new trial and/or judgment of acquittal based on the following grounds: (1) the Court's denial of defendant's motion to suppress statements and evidence; (2) the Court's pre-trial ruling on defendant's proffered entrapment defense; (3) insufficiency of evidence to support a conviction for possession of a firearm in furtherance of a drug trafficking crime (Count Two); and (4) insufficient evidence to prove an element of the counterfeit possession charges (Count Three). Each of these grounds will be addressed in turn.

A. <u>Pre-Trial Suppression Rulings</u>

The defendant contends the Court improperly denied the motion to suppress his post-arrest confession and the evidence found during the search of his house because his confession and consent to search was not free and voluntary. Specifically, the defendant contends that he only cooperated because the agents told him he could "work off his case."

However, the agents' testimony during the suppression hearing established that they merely told the defendant they were interested in his cooperation and that the U.S. Attorney's office would be informed of his cooperation. There was no testimony presented that the agents promised the defendant that if he cooperated he would work off his case. In fact, three agents testified that no threats or promises were made to the defendant prior to him giving consent to search and signing a written confession. In addition, the agents explained the consent to search form to the defendant before he signed it and informed the defendant of his Miranda rights before interviewing him. There was absolutely nothing coercive about the defendant's confession or

consent to search. Thus, we believe that there was no error in our finding that the defendant's confession and the evidence found at his residence should not be suppressed.

B. Pre-Trial Entrapment Rulings

The defendant further claims he was effectively precluded from presenting his entrapment defense where the Court ruled before trial that defendant's proffer was insufficient to support entrapment. This assertion is a misstatement of our pretrial ruling. The Court in no way precluded defendant's entrapment defense. In fact, we explicitly held that all the evidence contained within defendant's entrapment proffer could be introduced at trial. The only restriction was that the word "entrapment" not be used until the defendant presented enough evidence to warrant an entrapment defense. Although we noted that the proffer did not appear to provide a sufficient basis for an entrapment defense, we held that we would reserve a final ruling until the defendant presented his evidence at trial. The defendant then failed to introduce any of the evidence alleged in his entrapment proffer.

Moreover, even if the Court had made a pre-trial ruling precluding the defendant's entrapment defense, there would be no basis for a new trial or an acquittal. The Seventh Circuit has held that in cases in which the defendant cannot set forth *prima facie* evidence sufficient to demonstrate a viable entrapment issue, pretrial rulings barring the presentation of the defense are proper. *United States v. Blassingame,* 197 F.3d 271, 279 (7th Cir. 1999); *United States v. Santiago-Godinez,* 12 F.3d 722, 725-29 (7th Cir. 1993); *United States v. Johnson,* 32 F.3d 304, 307-08 (7th Cir. 1994). "As a prerequisite for presenting the defense of entrapment to the jury, the defendant must produce sufficient evidence upon which a rational jury could have inferred that he was entrapped into committing the crime charged.... Only if a defendant meets this

6

threshold burden is he entitled to present the question of entrapment to the jury for resolution." *Santiago-Godinez*, 12 F.3d at 727 (citations omitted); *See United States v. Jones*, 21 F.3d 165, 167 (7th Cir. 1994).

In order to submit the defense of entrapment to the jury, the defendant must produce sufficient evidence as to each of two elements: (1) government inducement of the crime; and (2) a lack of predisposition on the part of the defendant to engage in the criminal conduct. *Santiago-Godinez*, 12 F.3d at 727. Predisposition "focuses upon whether the defendant was an 'unwary innocent,' or instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Blassingame*, 197 F.3d at 280-81 *(quoting Mathews v. United States*, 485 U.S. 63 (1988)). "If there is sufficient evidence of Defendant's predisposition to commit the crime, the trial court may reject the entrapment defense and prohibit the defendant 'from raising the...defense at trial' without inquiry into the government inducement factor." *Id.* at 281 (citations omitted).

Because the defendant has an evidentiary burden before he is entitled to argue entrapment, courts routinely prohibit defense counsel from arguing entrapment "unless and until sufficient evidence has been presented to create a jury issue as to entrapment." *United States v. Finley*, 708 F. Supp 906, 914 (N.D. Ill. 1989); *United States v. Shields*, 1991 WL236492 at *3 (N.D. Ill. 1991); *United States v. Katz*, 1992 WL 137174 at *8 (N.D. Ill. 1992).

In this case, the defendant clearly could not establish a lack of predisposition. At trial, the government introduced the tape recorded meeting between the defendant and the CI on March 21, 2002. During that conversation, the defendant told the CI that he wanted a kilogram of heroin. After the CI stated he did not know anything about heroin, the defendant explained that a

7

kilogram of heroin sells for "about $100,000." In discussing the details of the planned cocaine-for-counterfeit transaction, the defendant made references to doing the transaction "just like we did last time." At one point, the CI stated, "so I go with the guy with the limo with the kilos and but the other guy is going with you to pick up the bag from you with the money, the ten keys or what." The defendant responded, "car behind the limo...just like we did it last time."

In fact, the defendant gave the CI explicit directions on how the planned transaction was going to occur, what cars were going to be involved, and who was going to have what role. At one point, the defendant stated, "[m]ake sure you see the cocaine and you are ready to put it in the car." The defendant also told the CI where to put the drugs once he got them from his source. Specifically, he said "put em in the car... in the passenger seat." When discussing how they would get rid of the cocaine after the deal, the defendant stated, "[y]eah, what I'll do, I'll take one of mine and we'll sell it. I come back and buy one from you. I'll sell yours in ten days."

The government also introduced the tape recorded phone conversation between the defendant and the CI on March 24, 2002. During that conversation, the defendant told the CI three times not to be nervous and to just go ahead with the deal. He then gave the CI directions about what the CI should tell his source. The defendant also told the CI that he does not want to talk much over the phone and asked the CI if he could meet with him. Finally, after the CI said he was meeting with his source the next day, the defendant asked the CI if he wanted the defendant to follow his source.

The recorded meeting and phone conversation between the defendant and the CI made it clear that the defendant had experience in these types of transactions. Specifically, the defendant expressed concern about talking over the phone, knew how long it would take to sell one kilogram

8

of cocaine, and gave explicit directions as to where, when, and how the transaction would occur. Furthermore, defendant's knowledge about the price of a kilogram of heroin and his offer to follow the cocaine supplier when the supplier met with the CI is not typical for a first-time drug dealer. What was even more telling was the defendant's repeated references to 'just like we did it last time."

Additionally, the March 25th transaction was not the defendant's first run-in with law enforcement, which was further evidence that he was predisposed to commit the crime at issue. Defendant had a prior conviction for criminal trespass to a vehicle. "Although a prior conviction is not determinative of the defendant's character or reputation, it nonetheless establishes that [defendant] was a less than law-abiding citizen." *Santiago-Godinez,* 12 F.3d at 729. In addition, defendant had been arrested on three other occasions. Prior arrests are relevant for determining a defendant's predisposition to commit criminal acts. *See United States v. Olson,* 978 F.2d 1472, 1483 (7th Cir. 1992).

Defendant was arrested for battery in 1994, disorderly conduct in 1995, selling and transporting approximately 1.7 pounds of marijuana in 1997, and aggravated assault in 2001. The drug arrest and the defendant's written confession related to that arrest were particularly relevant based on the charges in this case. Furthermore, defendant committed the current offense while he was on state bond for the aggravated assault charge. Given defendant's criminal history, his in-depth conversation and exploration of every facet of the deal with the CI, his knowledge about the price of drugs and the precautions that drug dealers take, and his recorded admissions about previous dealings, defendant cannot claim that he lacked a predisposition for narcotics trafficking when he engaged in the transaction at issue with the CI.

The CI's testimony rebuttal testimony, had it been necessary, could have provided further evidence of the defendant's predisposition to commit criminal activity. The government has indicated that the CI would have testified that prior to the March 25th transaction and before he was working for the government, he did three drug deals with the defendant in 2001. Specifically, the CI would have testified that the defendant bought one kilogram of cocaine from the CI on two different occasions. In the fall of 2001, the defendant bought 98 pounds of marijuana from the CI. For the marijuana transaction, the defendant paid the CI with counterfeit money, without the CI's knowledge.

The defendant also could not have successfully argued that he was induced to commit any crimes. First, the recorded phone conversation between the defendant and the CI revealed that it was actually the defendant who was encouraging the CI to go through with the deal. The defendant repeatedly told the CI not to be nervous and to just do it.

The structure of the planned transaction also did not qualify as an extraordinary inducement. "A person who takes advantage of an ordinary opportunity to commit a criminal act—not an extraordinary opportunity, the sort of thing that might entice an otherwise law-abiding person—is not entrapped. *Blassingame*, 197 F.3d at 281. In the March 24th recorded phone conversation, the defendant and the CI discuss purchasing 15 kilograms of cocaine for $300,000, which is approximately $20,000 per kilogram. According to the government, it was prepared to introduce testimony that $20,000 per kilogram of powder cocaine was the going rate for the time, was not an extraordinarily low price, and thus was not an "extraordinary inducement" to purchase within the meaning of the applicable case law.

The fact that the defendant planned to purchase the drugs with counterfeit money did not make the deal any more of an inducement. The defendant could not afford or was unwilling to pay the alleged price of the drugs and, thus, chose to risk getting caught buying and creating counterfeit currency in order to proceed with the deal. In fact, he was willing to risk his life by providing the CI's source with counterfeit currency. The level of risk the defendant had to take to purchase the cocaine demonstrates that in no way was the deal an extraordinary inducement.

Consistent with Seventh Circuit law, because the defendant would have been unable to make *a prima facie* showing of the requisite inducement and lack of predisposition, the Court could have properly precluded any suggestion of entrapment, either by argument or evidence, in this case. The fact that we did not do this means that the defendant actually got more opportunities than he was entitled to have. Therefore, defendant's request for a new trial and/or judgment of acquittal on this basis is denied.

### C. Sufficiency of Firearm Evidence

Defendant contends the evidence that he possessed a firearm during a drug trafficking crime was insufficient to support a conviction. Specifically, the defendant contends the testimony of four Secret Service agents and the fingerprint examiner was "unworthy of belief" and suggests the agents intentionally framed the defendant. However, "[c]redibility questions are rarely so severe as to require exclusion of witness' testimony, and thus the inclusion of questionable testimony will seldom require a new trial." *Washington,* 184 F.3d at 657. In this case, the testimony of the agents and fingerprint examiner was not even questionable, let alone questionable enough to warrant a new trial or acquittal.

According to the defendant, the agents' testimony was unworthy of belief because:(1) Agent McKenna did not include the defendant's admission in his original report but rather in an amended report that he made a few days later; (2) Agent Locus testified the gun was found under a floormat and no floormats were visible in the photographs taken by the agents on the scene; (3) the gun was not seen by the FBI agents on the scene at the moment they saw the drugs in the car ; (4) the informant had been in defendant's car but no agent saw the informant enter the car; and (5) there was no evidence the defendant ever attempted to use the gun on March 25, 2002. In regard to Agent McKenna's failure to put the gun admission in his original report, it was a mistake but certainly not grounds for discrediting his entire testimony, especially when his testimony was corroborated by three other law enforcement officers.

The fact that the agent in the surveillance van who testified at trial did not see the informant enter the defendant's car is also irrelevant. Agents saw the defendant driving the car and saw the informant in the passenger seat of the defendant's car. Furthermore, the defense has no basis for claiming the gun belonged to the informant. Agent Depodesta testified that he searched the informant for guns prior to the meeting. Moreover, the eyes of surveillance agents were on the informant the whole time. Their testimony established that the informant was never near the drivers side of the defendant's car.

Finally, the government was not required to prove that the defendant "used" the gun on March 25th. The indictment charges the defendant with carrying a firearm during, or in relation to, a drug trafficking crime. The government introduced evidence that the defendant carried the gun in his car. "[T]ransporting a gun in a car within reasonable reach constitutes 'carrying' for purposes of § 924(c)(1)." *United States v. Baker,* 78 F.3d 1241, 1247 (7th Cir. 1996).

For these reasons, we find that defendant is not entitled to a new trial and/or judgment of acquittal regarding the sufficiency of the firearm evidence.

D.   Sufficiency of Counterfeit Evidence

Finally, defendant asserts that the government failed to meet its burden with respect to Count Three because there was no evidence that the defendant intended to defraud someone. Contrary to defendant's assertions, the government did introduce evidence of this element, namely recorded conversations between the defendant and the CI during which the defendant expressed his intent to defraud the CI's alleged drug source. During their recorded conversation on March 21, 2002, the defendant and the CI discuss putting real money on top of the bag to "make it look real." They also talked about showing the drug source the money "real quick"—so the source would not discover that the money was counterfeit until the defendant had left with the drugs. During their recorded March 24th conversation, the defendant and the CI discuss putting five or ten grand in "good money" on the top of the bag, so if the source did look in the bag, there would be less of a risk that he would notice the counterfeit. Based on this evidence, we find that there is no doubt the defendant had an intent to defraud and, therefore, defendant's motion is denied.

## CONCLUSION

For the foregoing reasons, we deny defendant's motion for a new trial and/or judgment of acquittal.

It is so ordered.

Wayne R. Andersen
United States District Judge

Dated: December 2, 2002